## O. C. Crego and A. J. Stone
### v.
## The People, for use, etc.

*Principal and Surety—Release of Surety—Sale—Evidence.*

1.   The sureties on a bond conditioned for the payment by the principal of a certain amount for merchandise which may be furnished him, are not

liable to a beneficiary who agrees with the principal for the payment of a larger amount.

2. One who sells merchandise absolutely to a manufacturer who has given bond conditioned for the payment of such dividends as he may earn, can not hold the sureties liable.

[Opinion filed May 28, 1890.]

APPEAL from the Circuit Court of Kane County; the Hon. ISAAC G. WILSON, Judge, presiding.

Messrs. HOPKINS, ALDRICH & THATCHER and F. M. ANNIS, for appellants.

It is a universal rule of construction that a surety can not be bound beyond the express and literal condition of his undertaking. He has a right to stand upon the very terms of his contract. Field v. Rawlings, 1 Gilm. 581. Any agreement between the principal and his creditors, by which the terms of the bond are changed without the assent of the sureties, releases the sureties from liability. Cunningham v. Wren, 23 Ill. 62; Burt v. McFadden, 58 Ill. 479; Dodgson v. Henderson, 113 Ill. 360; People v. Toomey, 122 Ill. 308.

A surety is not bound beyond the precise words of his undertaking, and in case of doubt as to his liability, the doubt is generally solved in his favor. Stull v. Hance, 62 Ill. 52; Adams v. People, 12 Ill. App. 380.

The liability of sureties is fixed by the instrument they sign, and can not be enlarged or varied by judicial construction. Burgett v. Paxton, 15 Ill. App. 380; Mix v. Singleton, 86 Ill. 194; Phillips v. Singer Mfg. Co., 88 Ill. 305.

Mr. CHARLES WHEATON, for appellees.

A parol agreement to vary a contract under seal will not discharge the surety on a sealed instrument. Chapman v. McGrew, 20 Ill. 101; Chidester et al., v. S. & I. S. E. R. W. Co., 59 Ill. 87.

An obligation by an instrument under seal can not be discharged by parol. Davy v. Prendergast, 5 B. & A. 187; Bulteel v. Garroad, 8 Price, 467; Trent Navigation Co. v. Harley, 10 East, 34.

See, also, 1 Addison on Contracts, Secs. 361 and 362, where it is held : " That where two or more persons enter into a contract of a continuing nature, one of them can not, by his own act, discharge himself from liability and put an end to the contract, without the consent of the other, and that covenants under seal can not be discharged before breach by parol contract, whether executory or executed, nor could the performance of a covenant be waived by parol."

C. B. SMITH, J. This was an action of debt on a bond executed by James H. Broomell as principal, and Owen C. Crego and Andrew J. Stone as sureties, in the penal sum of $6,000, dated March 31, 1884. The condition of the bond was as follows :

"The condition of this obligation is such that if the said James H. Broomell, proposing to carry on the business of manufacturing butter and cheese on the dividend plan at a factory for that purpose, situated in the town of Aurora, in the county and State aforesaid, shall, on or before the first day of each month, make, acknowledge, subscribe and swear to a report in writing, showing the amount of products manufactured, the amount sold, the prices secured therefor, and the dividends earned and declared for the third month preceding the month in which said report is made, and shall file a copy of such report with the clerk of the town of Aurora, in which said factory is located, and shall also keep publicly posted in a conspicuous place in such factory a copy of such report for the inspection of patrons thereof, and shall further promptly pay all such dividend so reported, made and declared to the persons entitled thereto, then this obligation to be void, otherwise to remain in full force and virtue."

The declaration averred that Urch had furnished a large amount of milk to Broomell on the dividend plan, for the months of January and February, 1885, amounting to $325.28, and that Broomell had declared a dividend for these two months, but had not paid him the amount of such dividend, as required by the conditions of the bond, etc.

The plea was the general issue, with an agreement that all proper matters of defense might be made under that plea. A

jury was waived and the case tried by the court. The court found the issues for the plaintiff, and gave judgment for $293.15.

Broomell, the principal, was not sued, and the defense was made only by the sureties. The defense set up and relied upon was that Urch did not furnish Broomell milk on the dividend plan, and did not receive his pay for any milk furnished upon the dividend plan, but, on the contrary, sold his milk directly to Broomell, to be paid for at the prices fixed, and paid for milk by Mr. Moon, who was running a butter and cheese factory at Batavia.

Broomell opened his factory under the terms of this bond to his patrons, about the 7th of April, 1884, and suspended business about the 1st of March, 1885. He had between thirty and forty patrons in all, who furnished him milk on the dividend plan.

Urch furnished him milk during the entire time he operated until his suspension, and was paid in full for every month, except the months of January and February, 1885. Urch himself swears that he furnished his milk until about the 1st of August, for the dividends declared by Broomell at North Aurora, but that he then became dissatisfied with the dividends paid by Broomell, and then informed Broomell that unless he paid him the same dividends which Moon was paying his patrons at Batavia, which were higher than Broomell had been paying, he would not furnish him any more milk, but would take his milk to Batavia. The following extract from Mr. Urch's testimony on cross-examination will show what his understanding of the transaction was:

" Q.   You say the statements for the months of January and February were sent to you by mail and called for a larger amount per hundred than the dividends declared by Broomell for those months?   A.   Yes, sir.

" Q.   You were willing to take the money if you could get it?   A.   Yes, sir, I would take all I could get.

" Q.   As shown by the statements, though, it was larger than the declared dividend?   A.   Yes, sir, I knew what dividends Moon declared at that time.

" Q. Didn't Moon pay the exact amount that the statement sent you for January and February gave ? A. Yes, sir.

" Q. And that amount was larger than the dividend declared to the other patrons of the North Aurora factory ? A. Yes, sir. The statements sent me for November and December corresponded with Moon's. It was some time in August when he commenced to send me the Batavia dividend instead of his own. In August, or the fall of 1884, Broomell sent me an amount corresponding with the Batavia dividend rather than his own. It was not exactly by agreement. In the summer or fall of 1884 I was going to withdraw my milk from Broomell and take it to Moon ; I was not satisfied with the dividends he was paying. We had some talk on the subject. Before that he didn't send me as much dividends, and he paid me the difference afterwards.

" Q. That amounted to his paying you the Batavia price ? A. Yes, sir.

" Q. Then all the time you took milk there he paid you the Batavia price ? A. Yes, sir, made up the difference some time later.

" Q. Then he paid you more than he did his other patrons ? A. More than he did some of them.

" Q. You never objected when he sent you those statements corresponding with the amount Moon paid in Batavia ? A. No, sir.

" Q. How did he come to pay you more than he did the other patrons ? A. He came to my farm and said as mine was a larger quantity of milk he would guarantee me as large a dividend as Batavia paid, if I would take it to his factory.

" Q. Do you know what dividends Broomell declared for January and February, 1885 ? A. Not exactly, it was five or ten cents less than Batavia paid."

Urch swears that but one other patron of the Aurora factory had the same arrangement with Broomell with which he was favored.

Urch being called on behalf of the defense, further testified as follows :

" I had a talk with Broomell afterwards about that matter·

He came out to my place and said he would pay as much as Batavia paid. He wanted to get my milk, and I told him that I didn't want to take it there because he didn't pay as much as Batavia paid; and then he said he would pay as much as Batavia, or more, and would guarantee me as much as Batavia paid if I would bring my milk to his factory. I didn't make any arrangements with him at that time.

"Q. When did you? A. I didn't make any arrangement whatever with him. I put my milk in his factory and took his word for it."

James H. Broomell, the other party to the milk contract with Urch, testified in relation to the contract, as follows:

"Q. What contract or arrangement did you have, if any, with said William Urch for his milk, that is, the milk delivered at said butter and cheese factory at North Aurora? State fully. A. I had a contract during most of the summer and fall of 1884, to put his milk in at the same price as Moon paid at Batavia.

"Q. Did you purchase William Urch's milk to manufacture it on the dividend plan? A. I did purchase it and did manufacture it on the dividend plan during most of the summer of 1884. * * *

"Q. If you ever had any conversation with Urch about buying his milk and making it up on the dividend plan, state what those conversations were. A. I had one or two conversations with Urch about buying his milk and making it up on the dividend plan. I can not give the exact language, but the substance of these conversations was that Urch stated that he did not want to take his chances on the North Aurora dividends, but would sell his milk to me at the same price as Moon paid at Batavia, and if I would not do that he would take his milk to the Batavia factory. I tried to convince him that on the average he would do as well at the North Aurora factory, and had better continue on the dividend plan. Failing to convince him and fearing to lose his milk, I agreed to pay the same as Moon paid at Batavia."

These were the only witnesses who testified as to the terms of the contract, and it will be seen there is a substantial agree-

Crego v. The People.

ment between them. We think from the testimony of both of these men, that it is very clear that Urch did not furnish his milk to Broomell on the dividend plan after August, 1884, and that, even for the time preceding that date, Urch compelled Broomell to make good his loss, or difference between what he had received of Broomell and what he could have received at Batavia, on condition of furnishing him any more milk even at the advanced prices paid at Batavia, and that for all succeeding months the dividends paid by Broomell to his patrons at North Aurora had nothing whatever to do with the sum to be paid Urch for his milk, but that he was to receive in payment for his milk a sum equal to the highest dividends paid by Moon at Batavia, and the proof is clear and uncontradicted that he was paid the Batavia prices for the whole nine months he furnished milk and that for all this time he received a higher price for his milk than Broomell's other patrons, with one exception.

This was a wholly different scheme from the one guaranteed by the condition of the bond. The condition of the bond is that the principal, Broomell, should pay all such dividends as were earned and declared at North Aurora, and from such milk as was furnished there, for the purpose of accepting in full payment for such milk only such dividends as could be earned and declared at North Aurora. The obligors on this bond did not obligate themselves to pay dividends which might be declared at Batavia, or any that might be equal to others declared at Batavia, unless the business justified such dividends, and even then such dividends must be alike as to all patrons, and give to each patron his just proportion of the net earnings of the factory.

The contracts and obligations of sureties are always to be strictly construed in favor of the sureties. Nothing can be taken by implication or argument. The strict and clear letter of the bond is the measure of their liability.

Beneficiaries under the bond will not be permitted to enlarge the liability of sureties, or to change their contract, by any sort of device. This rule is so elementary that citations in its support are hardly needed, but we refer to two: Dodgson v. Henderson, 113 Ill. 360; People v. Toomey, 132 Ill. 308.

This scheme entered into by Urch and Broomell was liable to operate as a fraud upon every other patron of Broomell, for just in proportion to the excess of Batavia prices over North Aurora prices paid Urch for milk, to that extent diminished the fund out of and from which the dividends to every patron of the North Aurora factory should have been equally declared, if Urch was paid in full out of the earnings of the Aurora factory. Under the private arrangement between these parties Urch received more than his just share of the earnings of the factory, and every other patron received less than his just share, and to that extent was defrauded by the act of Urch.

We think the proof shows an absolute sale of the milk by Urch to Broomell, and that the price to be paid was to be fixed by Mr. Moon, of the Batavia factory.

In Gould v. Warne, 27 Ill. App. 651, it was held that bondsmen under a bond like the one in this case were only liable for dividends earned and not paid by the factory earning and declaring the dividends, and it was also held in that case that in cases where the proof should show a direct sale of the milk to the factory, then the bondsmen would not be liable for the purchase price of the milk.

The court below gave plaintiff judgment for only so much as he would have been entitled to if he had furnished the milk on the dividend plan, but this did not cure the fault. Under the proof he did not furnish his milk under the bond, and he has no rights under the bond whatever. The whole transaction was outside the bond, and plaintiff can not now remit what he intended to receive by an unfair scheme, and place himself under the protection of the bondsmen, and compel them to make good his loss.

It is also insisted the court erred in refusing to hold certain propositions as law, which were submitted by the defendants on the trial below. So far as this objection relates to the first, second and fifth propositions, we think the court properly refused to hold them as correct propositions of law, for the reason that they do not state propositions of law, but simply a statement of facts.

But we think the court erred in refusing to hold the third, fourth, fifth and seventh as correct propositions of law. These propositions are all in harmony with the views we have expressed in this opinion, and we think contain a correct statement of the law upon the facts in proof.

The sixth proposition is not important, since it simply announces a correct legal conclusion from the evidence, and it may be doubted whether it announces such a legal proposition as made it the duty of the court to pass upon it.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*